May it please the Court, Timothy Berg of Fenimore Craig on behalf of Maricopa County. I'd like to reserve five minutes for rebuttal. Here are the District Court's ruling on the motion to dismiss that there was no contract between Maricopa County and Office Depot. Despite the fact that Maricopa County purchased $22.5 million in office supplies from Office Depot was plainly erroneous. And that error infected the rest of the rulings in the case. At first glance, it seems, I think part of what makes this case seem complicated is the volume and perhaps complexity of the agreements involved. But if you start with the simple proposition that my client, by purchasing $22.5 million of goods, had to have a contract with a person from whom they were purchasing, then that error by the District Court, not fundamental in the legal sense, but fundamental in the practical sense of underlying everything else. You mean a direct contract without status as a third-party beneficiary of a contract? Your Honor, I think we have three potential contract claims here based on the master agreement. One is that we were a direct party to the master agreement by virtue of opting in under paragraph 36 of that agreement. So we have a contract. We are a contracting party to the master agreement with Office Depot. The second would be that we're a third-party beneficiary. If you don't view us as having rights as a direct party by opting in, pretty clearly paragraph 36 gave us third-party beneficiary rights under that master agreement, including the Most Favored Nation Clause in paragraph 23 of that agreement. The third way we get there is to say that under the UCC 2-204, which is embodied in both the Arizona commercial law and the California commercial law, by virtue of the fact that Maricopa County purchased goods from Office Depot over a period of five years, they have a contract whether or not there was ever a signed agreement between the two of them. And I think in any of those three ways, Judge Stearns, we have a contract and the district court with all due respect simply got it wrong by dismissing our direct contract claim. And on that basis alone, this Court should apply. Well, the third basis seems to me to be the weakest, because by that argument, if $22 million gives you a contract, a smaller municipality that, say, bought $100,000 worth of supplies would then be excluded from the contractual relationship. No, Your Honor. I think it's a question of the UCC of did the parties intend to have a contract. And clearly I think where there are purchases, it doesn't necessarily have to be $22 million. It could be $100,000. But where the parties engage in commercial transactions, particularly over a period of time like five years, the parties clearly have a contract. To go right to the issue of the case, does the record show whether at the time Home Depot, I'm going to end up calling it Office Depot, Home Depot, they're going to get interchanged. Yeah, Office Depot in this case. Yeah, Office Depot. I understand, Your Honor. Entered into the relationship with Los Angeles County, were they aware of the preexisting agreement that Office Depot had with the County of San Francisco? There is nothing in the record that reflects that the L.A. County people knew about the San Francisco contract. It is clear that Office Depot knew about the contract because it was Office Depot's contract. Is it clear that U.S. communities knew about it as well? I don't believe so, Your Honor. There's nothing in the record that I know of that reflects that U.S. communities knew. But more to the point, there's certainly nothing that reflects that Maricopa County knew. And if we're talking about here is a contract between Maricopa County and Office Depot, it would be Maricopa County's knowledge that would be relevant in the case of the direct contract claim. Mr. Berg, let me clear up something. You claim a direct contract right through paragraph 36 of the master agreement. That's your first argument. Yes, Your Honor. Then the second was a third-party beneficiary. Is it also under 36 or is it under the pricing commitment? We are potentially third-party beneficiaries of two different contracts, Your Honor. I thought so. The first one is the master agreement, and under that one we would be a third-party beneficiary by virtue of paragraph 36 of the master agreement as well as a number of provisions we've cited in our brief that were contained in the master agreement and in the attachments to the master agreement. The second claim, the one that the judge didn't dismiss but granted summary judgment against us on, was a claim that under the administration agreement, under the pricing commitment of the administration agreement, we were a third-party beneficiary of that contract and we're entitled to enforce that to the tune of being able to benefit by the prices that were ultimately charged to San Francisco. He ruled against you on that. On summary judgment. On summary judgment, by interpreting the agreement not to include you. Yes. He — I think the district judge — there was a three-step process the district judge followed, and he got the first two steps correct from our point of view and missed the third one. The first one was he concluded that the pricing commitment was ambiguous. Right. That was correct. Second, he concluded that he should consider extrinsic evidence. Let me just stop you for a second, Mr. Berg. And you can take a moment to consider your words. Is it the position of the appellant that the district court was correct in finding that the pricing commitment is ambiguous? Your Honor, our position in the district court was that it was unambiguously in our favor. It was. As well as taking the position that if — well, let me back up for just a second. Let's speak clearly. Yes. Absolutely, Your Honor. Number one. Number one. Are you taking the position that the pricing commitment was unambiguous and in your favor? Your Honor, that was a position we took in the district court. And not that we have argued in the briefs to you, but certainly it would be our position. You took that position in the district court. Did you abandon it on appeal? No. Your Honor, what we — the district court found that the agreement was ambiguous. He admitted extrinsic evidence and then concluded that the correct interpretation was inconsistent with ours. We appealed that judgment of the district court. We did not specifically argue to this court, I don't believe in our briefs, that summary judgment should have been entered in our favor. Certainly that's a remedy that if the court were to look at the agreement and conclude it was unambiguous and it was in our favor, I think it's within this But our argument that we made to you in the brief, just so I'm being clear and candid with the court, is that the district court — the district court concluded — It prematurely decided the issue, which should, in your view, have gone to a jury or to a fact finder? Yes, Your Honor. Our view, our fundamental argument on the summary judgment is that there was conflicting evidence from the U.S. community's folks and from the office depot folks. Right. And that as a result of that, the district court could not itself decide that issue. It had to submit it to the trier of fact, which in this case would have been a jury trial. I'm sorry. When you say conflicting evidence, what you're pointing to, there's certainly no confusion on the part of U.S. communities, as I understand it, that they, as far as they were concerned, did not believe that Maricopa was eligible for the San Francisco prices. Your Honor, I believe in our — I'm sorry. You just may finish. The conflicting evidence you're pointing to is lower-level personnel of office depot sales representatives who made representations about what benefits would accrue to Maricopa. Your Honor, I believe we weren't talking — well, let me answer that question in two parts. One, I think in our brief we cite some testimony from U.S. communities. It's clear that the great weight of the U.S. community's testimony supports office depot's interpretation. I'm not here telling you something different. What we relied on was the testimony of our witnesses and predominantly the testimony of the office depot witnesses who were not, in my judgment, at least low-level salespeople. You had Mr. Satina, who signed the master agreement. He was the person office depot designated to sign the master agreement, and he testified that his understanding was similar to ours. What did the district court do with that evidence? The district court concluded that unless — this is a slight exaggeration of the district court's opinion, but not much — unless the testimony of the office depot people specifically referenced the pricing commitment as opposed to the transaction as a whole, the district court concluded it didn't need to consider that evidence. So it ignored Mr. Satina's statement, the person who signed the agreement? Yes. It ignored Mr. Satina's statement. It ignored the statement of the — And what rank did Mr. Satina have? Your Honor, I don't have that title right in front of me. I know it's in our brief, and I know he was — But he was a senior executive of the company. He was a senior executive of the company, and he was our designated 30B6 witness also, I believe. So he clearly wasn't — not to denigrate salesmen, but he clearly wasn't somebody that they sent out on the road with a package full of fuller brushes to sell. He was a high executive in the company. And your position is that this is conflicting evidence with the evidence we've heard that was in the record with — which might support the office depot view, and therefore, it should have gone to a jury or at least should not have been decided under summary judgment? Yes, Your Honor. As to the — as to our claim under the — under the administrative agreement, the pricing commitment, that's exactly correct. We believe that there was a genuine issue of disputed material fact based on the conflicting evidence of the two parties, U.S. Communities and Office Depot, and that creates a genuine issue of material fact that the district court should not have decided. He got to the correct point of admitting the extrinsic evidence, even recognize the two interpretations were unreasonable, to a certain extent recognize they were a significant body of evidence and that violates the Rule 56 standard in federal courts, including that which says when we're being moved — when we're the non-moving party on a motion for summary judgment, inferences should be drawn in our favor. And clearly, whatever else the court did, it didn't draw inferences in our favor on that issue. Now, Los Angeles County never expressed the belief that it was entitled to the San Francisco prices, did it? There is nothing in the record that indicates that anybody offered any witnesses from Los Angeles County, Your Honor. I don't have an answer as to why, but the witnesses that were offered in our case, again, our basic and frontline theory was that we had an agreement between Maricopa County and Office Depot, so we thought that the testimony of those two parties was the important one. Not to speak for the counsel for the appellee, but their theory seemed to be that U.S. communities was the determinative source of testimony, and so you had testimony from Maricopa County, Office Depot, and U.S. communities. So I'm clear. Maricopa is not arguing that it was eligible to participate in the San Francisco contract. Rather, the Office Depot was obliged, what, to sui sponte, offer the same price? Yes. And in fact, Your Honor, if you look at paragraph 23 of the master agreement, what it says is that if Office Depot sells at lower prices to any other governmental entity in California, this is, I'm paraphrasing, now I'm going to give you the exact language, such lower prices will be immediately extended to the county. It is our position that both Los Angeles County, as the county referenced there, and Maricopa County, by virtue of paragraph 36, should have had those prices extended to them without regard to whether they asked for them. Frankly, the contract says you're going to extend the price to us. Not that Los Angeles County has a right to ask for it. Not that Maricopa County has a right to ask for it. But simply, the obligation under paragraph 23 of the master agreement was we were supposed to be charged those prices. And there is nothing in the record that ever indicates that that was done. Well, doesn't it go on to say, though, if extended to another State entity, if you are otherwise eligible to participate in an arrangement that we have, similar to the one that U.S. Communities has negotiated? Your Honor, you're talking about two different contracts and two different clauses. The master agreement simply says that they represent that the prices they're going to charge the county, in this case L.A. County, and then ultimately us by virtue of paragraph 36. They don't have anything that the prices that they're charging don't exceed existing prices, and that if they lower prices, those prices will be extended automatically. The eligible and available language is in the pricing commitment in the administrative agreement. We disagree with there's conflicting extrinsic evidence as to what that language meant in the administrative agreement, but it has nothing to do with the rights that you would have under the master agreement under paragraphs 23 and 36. I say because there are so many documents here, it gets a little challenging to keep them separate, but they're two distinct claims. One is under the master agreement and the other is under the administrative agreement. Now, with respect to the master agreement, which the district court dismissed the claim, what is the county's position with respect to why it should not have been dismissed? It should not have been dismissed because that contract contained a most favored public entity clause, and by virtue of paragraph 36 of the of that master agreement, Maricopa County was permitted to opt in and have a purchase at prices stated in the business agreement or lower. It had the rights L.A. County had, and either as a direct party or a third-party beneficiary, we were entitled to enforce that, and certainly the district court should not have dismissed that at the dismissal stage before we had a chance to develop a further record on it. At the very least, the claim was pledged sufficiently to survive a 12B6 motion. I see I have a few minutes left. I'm going to reserve that for rebuttal. Thank you very much. Thank you. You may proceed. Thank you, Your Honors. May it please the Court, Julianne Lund on behalf of Office Depot, Incorporated. Before I turn to Office Depot's arguments, I would like to clean up the record. I think there were several statements that were made in response to questions from the Court that did not accurately reflect the state of the record. The first is that, in fact, there is evidence in the record that both Los Angeles County and U.S. communities were fully aware of both the existence of the San Francisco contract and of the allegation that its pricing violated the contracts that were in existence at that time by being lower than the L.A. County master agreement pricing. Excuse me. Could I ask you to bring the microphone closer to you? I'm having difficulty hearing you. I'm sorry. I apologize. Is that better, Your Honor? That's much better. All right. Thank you. So that e-mail, which reflects that Corporate Express, which was a competitor of Office Depot for the San Francisco contract, had raised this allegation that the San Francisco pricing was lower than the, at that time, 2001 master agreement pricing for Los Angeles County. It raised it with U.S. communities, and U.S. communities then raised that concern with Office Depot and expressly said it needed to be discussed with Joe. Joe is a reference to Joe Sandoval, who is in charge of purchasing at Los Angeles County. And you can find that e-mail communication at our supplemental excerpts, pages 230 through 231. So it's absolutely clear that both U.S. communities and Los Angeles County were aware in 2005 of the allegedly lower San Francisco pricing. Neither of them chose to take any action with regard to it. And, in fact, there's testimony in the record by Stephen Hamill, who is the founder and, at that time, general manager of U.S. communities, who testified that he viewed the San Francisco contract as a one-off and, therefore, not covered by the pricing commitment. That is, it was a standalone contract that did not permit piggybacking. Critically, Your Honor, that same representation was made by U.S. communities to Maricopa County in 2012. When Maricopa County was investigating whether it should bring this lawsuit, it reached out to U.S. communities and made the notation that it believed the San Francisco contract entitled it to lower pricing. And what U.S. communities told Maricopa County then was that they were wrong, that, in fact, the San Francisco contract did not apply because nobody else was eligible to purchase under it. And, critically, there was no one else was eligible to purchase under it. That is, it was a standalone contract. It did not have any piggybacking provisions. All right. What is the relevance of these observations that you're making? Well, I think what's critical is that Maricopa County here is trying to shift the game board and say what we're really talking about is not contracts between Office Depot and U.S. communities or Office Depot and Los Angeles County. We're talking about a contract between Office Depot and Maricopa County. And that means Maricopa County's intent matters. I'll address in a moment why that's absolutely wrong. There's no direct contract. But more critically, when U.S. communities, before this suit was brought, told Maricopa County, you are wrong about the pricing commitment. It is limited to eligibility. Maricopa County's response was not, wait a second, that's not our understanding. It, in fact, echoed and adopted that statement. It said the question to me is whether we were eligible to purchase under the San Francisco contract. Well, the question in front of us, is it not whether the — with respect to the master agreement, the district court properly dismissed the claim? In other words, were there other reasonable interpretations that could have gone before a jury or at least been subject to a legal interpretation? So, Your Honor, with regard to the master agreement, which is section 23, I'm sorry, with the most favored customer clause, section 23 of the master agreement, there is no dispute. But it's also 23 and 36 taken together, is it not? Your Honor, those actually have completely separate purposes. So section — Yeah, but it's the same document. It is, absolutely. And it's important to understand what the purpose of the piggybacking was that's set forth in section 23 — excuse me, section 36. If you look at section 36, it indicates that the county, which has been defined in the master agreement to mean Los Angeles County, is enabling other agencies such as Maricopa County to piggyback on its contract. And what it says is, participating public agencies may acquire items listed in this agreement. Such acquisitions shall be at the prices stated in this agreement or lower. There is no statement in section 23 that says you are entitled to assume the contract. You are entitled to usurp Los Angeles County's role as the controller and administrator of the contract. There is no statement in section 20 — excuse me, section 36 that would permit a piggybacking agency like Maricopa to affirmatively assert those rights which are reserved to the county of Los Angeles. So your position is that paragraph 36 under the master agreement gives Maricopa County the same rights as L.A. County and nothing more? No, absolutely not, Your Honor. Our position is, as with any third-party beneficiary contract, the rights that are given to the third-party beneficiary are expressly limited to those rights agreed to by the parties. What Los Angeles County and Office Depot agreed to in the master agreement was that piggybacking agencies such as Maricopa would have a very narrow section of rights. Under the agreement, they are entitled to, one, purchase items at the prices stated in the contract. Two, they are entitled to receive price lists. And, three, they are entitled to receive something known as a usage report. It is essentially a listing of structured data that shows everything they purchased and the price at which they purchased it. Other than that, the contract repeatedly and expressly limits rights to COUNTY, all caps. And that is defined in the contract as meaning the county of Los Angeles. Scalia, what do we do at page 62 of your brief where you say, if Los Angeles County received lower prices through the operation of section 23, Maricopa would thereafter be entitled to purchase products under these prices and to enforce those prices pursuant to section 36? Absolutely, Your Honor, and I apologize if I have not been clear. There are two different levels of contract operation here. At the top level, there's contract administration. The master agreement makes it clear that everything to do with contract administration is solely reserved to Los Angeles County. That means extending the contract, terminating the contract, altering prices, whether through operation of section 23 or otherwise. But once those prices are set, once they are adopted in an amendment and put out in a price list, every piggybacking agency is absolutely guaranteed those prices. And if those prices aren't provided to them, they of course have the right to sue. That is their right as a third-party beneficiary to say, this box of pencils is listed at a dollar, you charge me $1.50. That is no – there's no dispute that that is their right. The question is whether they are entitled to arrogate the responsibilities that Los Angeles County reserved to itself in terms of administrating the contract. And there is no language in the entire master agreement that would support that reading. Well, I'm looking at the administrative agreement at the moment and the pricing commitment section. A commitment that suppliers' U.S. communities' pricing is the lowest available pricing net-to-buyer to State and local public agencies nationwide. Isn't that inconsistent with what you've just been telling us? No, Your Honor. And that's because it's critical to remember that we're dealing with two distinct contracts with two distinct sets of provisions. But they're interrelated, are they not? They are, yes. But you have to remember that the master agreement is the contract that establishes the prices for all of the piggybacking agencies. What the administration agreement does is provide the administrative structure and marketing support and so on that is used by the suppliers to help get the word out. And the purpose of the pricing commitment, along with the other two commitments in the supplier commitments, the corporate commitment and the sales commitment, is the foundation of the relationship between U.S. communities and its suppliers. It is intended to grow the U.S. community's customer base so that both the supplier and U.S. communities benefit. And as U.S. communities has consistently stated, the way that it does that is by ensuring that there are no barriers to entry for any public agency. That is, if I have a contract that I view is better for me for my personal purchasing habits, and I look at the L.A. County contract available through U.S. communities and say, I'd love to be a part of U.S. communities, but I don't want to give up this better pricing, what the pricing commitment says is, don't worry about that. You can obtain all the benefits of being a U.S. community's member, which means not only access to Office Depot's contract, but access to all of our other supplier contracts without having to give up this pricing that you prefer. Instead, Office Depot simply pays administrative fees to U.S. communities on that preexisting contract. That's really your argument, isn't it, that you have to look at this as a commercially reasonable undertaking? That's absolutely. I'm sorry, in President Obama's words, people typically don't do stupid stuff, at least in a business context. The point of the contract was to simplify purchasing, both for the counties and municipalities, and more particularly for Office Depot, which was then left with simply one party to placate, if necessary. That's exactly right, Your Honor, and we detailed in our briefing some of the elements of absurdity that would come in if every piggybacking agency was allowed to enforce the pricing commitment. In fact, the way that it's been rewritten by Maricopa County, it applies even more, because essentially what Maricopa County says is that the pricing commitment is not, as U.S. communities and Office Depot always said, a single commitment. It's two separate commitments, the first of which requires Office Depot to match lower pricing of any contract it held, and the second of which requires Office Depot to match competitors' pricing. It is difficult to imagine any rational actor that would agree to that second component. But even as to the first component, if it's limited to eligibility, as we believe the language shows, then Office Depot has a very minimal additional administrative requirement. It has to ensure that for those handful of agencies who may be eligible for one or two additional contracts, that the pricing that is being provided through U.S. communities is the lowest. If it is unlimited and there's no eligibility requirement, then suddenly Office Depot is required to take hundreds of contracts and tens of thousands of customers and to compare the pricing, millions of difference of pricing comparisons, to determine whether for any particular agency as to their own market basket of good, that net-to-buyer language, whether they would be doing better under a different contract, that's just administratively impossible within the confines of the relationship. I suspect a straw man here because I don't think that's what Maricopa County is asking. It is, in fact, Your Honor. They are saying that the Most Favored Customer Clause, apparently by its plain language, means that Office Depot has to give the lowest pricing to everyone. But what net-to-buyer means and recognizes is the different pricing, the pricing is better for different people in different ways. Take a very simple example. Imagine that you are San Francisco. You're very focused on environmentally friendly purchasing. What you want is printer paper that has a certain amount of post-consumer waste. And so you negotiate strenuously for heavy discounts on green printer paper. Los Angeles County, by contrast, might just want whatever paper is cheapest, not necessarily focused on the green benefits of it. As a result, there might be no discount on green paper through the L.A. County contract, but a very steep discount on non-recycled paper. Depending on what kind of paper you buy, you may prefer San Francisco pricing versus Los Angeles pricing. That's one product. Imagine a contract that literally contains thousands of different products with different discount structures, both core and catalog and non-catalog, and all the different items that might be bought depending on whether you're, say, a school district or a municipal board or a mosquito control district. All of those will have a different net-to-buyer result in terms of their unique market basket. And so the complications just expand ever outward if you interpret the pricing commitment as Maricopa County does. So, finally, I wanted to, with regard to this issue, to address one other statement that I don't believe was accurate with regard to the record, and that is that Maricopa County's counsel suggested that the district court simply ignored Mr. Cetina's testimony. In fact, if you look at Excerpt 47, you will see that the district court squarely confronted the lack of knowledge that Mr. Cetina had, admittedly, that he testified to with regard to the pricing commitment. What Mr. Cetina said and what all of Office Depot's sales force said when they were deposed was that they were not in charge of contract administration. They were not trained on the unique provisions of the two different contracts, the master agreement and the administration agreement, that made up the U.S. Communities Program. They were instead trained to sell the program. If they had a question about the meaning of a provision, they would look to the legal counsel. And, in fact, that is what Mr. Cetina testified what he would do, and it's what the record reveals he did do. And that's if you look at his testimony at our supplemental excerpts at 643 through 645, he discusses how he would consult with Office Depot's counsel as to the meaning of the pricing commitment or contract terms. And if you look at the next paragraph, it says, Well, Counsel, what are we supposed to do with this passage from Mr. Cetina? The pricing commitment meant that the U.S. Communities client would be assured that their market basket would be the lowest price available to government and local public agencies from Hawaii to Puerto Rico and New York to San Diego. He's the person that signed the contract. He is, Your Honor, but he had absolutely, by his own sworn testimony, no role in administering it, no understanding of the contract. He testified. He never sat down and parsed out the provisions. Roberts, doesn't that create an issue of fact at that point? It does not, Your Honor, for two reasons. First, I think because Mr. Cetina himself acknowledged that his understanding could easily have been drawn regarding the most favored customer clause in the master agreement, section 23. That's further in his testimony. You'll find it in our supplemental excerpts. But also because under clear California law, Mr. Cetina's statement is simply irrelevant and inadmissible. And that is because California follows the objective idea of contract interpretation, which means that subjective, undisclosed intent is simply not admissible as evidence. And we set this out in the Ribiero case in our briefing, which presented a situation on all fours. That is, there was the defendant attempted to cross-examine the plaintiff on an undisclosed subjective intent regarding the contract. The Court said that was absolutely not admissible. The sole exception is where that undisclosed subjective intent actually supports the mutual intent of the parties. That, of course, does not exist here because U.S. communities' mutual intent, as the record indisputably displays, is or U.S. communities' intent was that the pricing commitment is not a most-favored-customer clause. It is absolutely required to be limited to eligible agencies. And then also, the other important point is that under SUSA, Maricopa County, as a third-party beneficiary, is standing in the shoes of the promisee, here U.S. communities, in seeking to enforce its rights under the pricing commitment. What that means is that it takes both the benefits and the detractions of that relationship. Because U.S. communities drafted the pricing commitment, all ambiguities are construed against U.S. communities, and that means they are construed against Maricopa County. Maricopa County cannot argue for a broader understanding of the pricing commitment than U.S. communities itself has consistently, repeatedly, and publicly articulated. I just wanted, finally, to address the direct contract issue that Maricopa County's began with, and that is that it's certain that there are $22 million, approximately, of sales involved here. But that's not the same as saying there must be a direct contract. Instead, there's also indisputably a third-party beneficiary relationship that created the ability for Maricopa County to make those purchases, under which Maricopa County, in fact, did make those purchases. And therefore, to the extent that Maricopa County wants to sue regarding the pricing it paid for those purchases, it is bound by the terms of those two contracts. If I can briefly address our fees argument, Your Honors. The district court here used what it described, or what this court has described, as a meet-ax approach. That is, it slashed large swaths of our fees, 50 to 75% as to certain categories. While this court has permitted that approach, it does require that the district court provide a clear and concise explanation tied to the record, both for why the cut was made and for why the percentage was selected. The district court failed to do that here. Instead, it simply reiterated again and again that it believed those fees were excessive. But as this court has repeatedly held, excessive is a conclusion. It is not the clear and concise explanation that's required by precedent. Similarly, when the district court did point to the record, it repeatedly revealed that it had misapprehended the nature of the record, in large part, we believe, because of a confusing and opaque expert report that was submitted by Maricopa. Now, Maricopa, in its response on this issue, has never argued that, in fact, those errors were not in the district court's decision and were not in its underlying report. Instead, it asked the court to simply ignore that and to focus on the conclusory excessive. But even under this court's case law, excessive standing alone is a basis for reasoning and for remand when there's no further explanation provided. Here, where the court provided an explanation that is divorced from the record and, in fact, inconsistent with the record, remand is certainly compelled. Kennedy, you'd have no real quarrel if the court had just simply said, I think the errors are excessive, so I'm going to reduce the fees by 20 percent. I think what you're saying is that there are some basic mathematical errors that the court may have made by actually slashing you twice without realizing that he had done that. It's actually both, Your Honor. Under the court's existing precedent, the district court was absolutely entitled to give an across-the-board haircut of up to 10 percent of our fees without any explanation at all. But anything beyond that required explanation and substantiation in the record, and neither one was included. And then, of course, the court considered an impermissible factor, the allocation of work by Office Depot in putting a 20 percent Lodestar adjustment, and that was additionally an abuse of discretion. Thank you so much. Thank you very much for taking the time. Yes. I'm not going to address the attorneys' fees question unless the court has a question for me. I think it is clearly within the discretion of the trial court to determine that too much time was spent and that some of it should have been spent by associates instead of partners or counsel in their law firm. I don't have anything more to say about that. Let's go back to what counsel for Office Depot said, though. She said to you, when you look at the master agreement, what Maricopa County is trying to do is take over L.A. County's role as the administrator of that agreement, and that isn't what paragraph 36 says. Here's what Maricopa County thinks the master agreement says and what its rights are. First, paragraph 36 says that we are entitled to the same prices as L.A. County or lower. Second, paragraph 23 says that if Office Depot charges another government entity lower prices, those prices are to be extended automatically to L.A. County. What is Maricopa County asking for? It's not asking to administer this agreement. It's not asking to change the price list. It's not asking to change the list of goods that can be bought. It's asking for its right under those two clauses. It's entitled to the same prices L.A. County is entitled to, and L.A. County was entitled to those lower prices automatically without doing any contract administration. That's the nature of our direct claim under the master agreement, and that should not have been dismissed by the district court. Did, pardon me, did Office Depot ever extend the San Francisco prices to L.A. County? Your Honor, not that I am aware of. There's nothing that I recall in the record that evidences that they did. We talked to you about a genuine issue of material fact with respect to the price and commitment. Again, Office Depot wants you to pay no attention to their own witnesses saying, well, these people didn't know what they were talking about. They weren't qualified. They weren't lawyers. And Office Depot is certainly entitled to argue that to a jury. They're entitled to say the person in our company who signed the contract, who is our vice president of government and education services, didn't know what the contract meant when he signed it. But that's for the trier of fact to determine. His testimony about what he understood and the testimony of all of the other Office Depot witnesses and materials that Office Depot had that are set forth in our brief are, at very least, genuine evidence of a, material evidence of a genuine issue of material fact that should have precluded summary judgment on the price and commitment issue. And that is all we need show. The next argument Office Depot makes is, well, Mr. Satina's undisclosed intent doesn't matter. First of all, your honor, there's testimony from the Maricopa County witnesses that they were told by Office Depot that they were going to get the best price given to any governmental entity. If you look at the materials as a whole, including all of the attachments to the master agreement, the same thing was told to LA County. And in fact, the most favored nation clause in the master agreement and the LA County RFP both say that they get the best prices they charge any other governmental entity in the state. Which would, at least the last time I looked at a map of California, included San Francisco. It isn't an undisclosed intent. And it certainly, again, goes, if Office Depot wants to argue a trial, not only did these folks not know what they were doing, that wasn't what we were telling people. That's for the trier of fact to determine based on the evidence that's in this record. There is simply sufficient evidence to create a genuine issue of material fact. In addition, the Ribeiro case they rely on, if you look at our brief, and I don't have a page set, I apologize. Undisclosed intent can be used against the party whose undisclosed intent it is. I can't testify that I had a contract with Judge Stearns, and I didn't tell him something, but he's bound by my undisclosed intent. I think it's different to say what Judge Stearns' statements of his intent disclosed to me or not are probative if I'm trying to enforce his promise against him. That's a different proposition. But again, it doesn't matter here. All of that goes to the weight of the evidence, and there is at very least a genuine issue of material fact. I have just a few seconds. Trial court should reverse the judgment and remand it to the district court for further proceedings, both on our claims that were dismissed and the motion to dismiss, including the statutory fraud claim I haven't had a chance to talk about, and vacate the summary judgment and reverse that also. This matter should be tried to a jury to decide what these agreements mean. Thank you all very much. Thank you, Mr. Muir, thank you, Ms. Lund, and the case of Maricopa versus Office Depot will be submitted. And we'll stand in recess until 9 o'clock tomorrow morning.
judges: O'scannlain, Bea, Stearns